Filed 6/18/15  P. v. Garcia CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B250582 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA381662) |
| v. | |
| PETER IGNACIO GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William N. Sterling, Judge.  Affirmed.

Jonathan P. Milberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Peter Ignacio Garcia appeals from the judgment entered following his conviction by jury of voluntary manslaughter, evading an officer, and possession of a firearm by a felon. Defendant contends that there was insufficient evidence at trial to support his voluntary manslaughter conviction, and that the trial court erred in refusing to either grant his motion for new trial or dismiss the charges in the interest of justice. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

### I. Procedural Background

In an amended information filed on October 1, 2012, defendant was charged with the murder of Christina Salazar (Pen. Code, § 187, subd. (a) (count 1)),[1] evading an officer with willful disregard (Veh. Code, § 2800.2, subd. (a) (count 2)), and possession of a firearm by a felon (§ 12021, subd. (a)(1) (count 3)). The information contained special allegations that in count 1 defendant personally and intentionally discharged a firearm, causing great bodily injury and death (§ 12022.53, subds. (b), (c), and (d)), and that defendant was armed with a firearm in connection with count 2 (§ 12022, subd. (a)(1)). The information further alleged that defendant suffered convictions of a prior serious or violent felony (as to all three counts) (§§ 667, subds. (b)-(i), 1170.12), conviction of a prior serious felony (as to count 1) (§ 667, subd. (a)), and that defendant served a prior prison term for a serious felony and failed to remain free of custody for a period of five years following the conclusion of that term (§ 667.5, subd. (b)).

The jury trial commenced in October 2012. On October 23, 2012, the jury acquitted defendant of murder, but found him guilty of the lesser included offense of voluntary manslaughter on count 1 (§ 192, subd. (a)). The jury further found the firearm

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

enhancement true as to count 1(§ 12022.5, subd. (a)).[2] The jury also convicted defendant of counts 2 and 3 and found the firearm enhancement true as to count 2. Defendant waived his right to trial on the prior conviction and prison term allegations and subsequently admitted them.

On June 28, 2013, the trial court heard and denied defendant's motion for new trial. The court sentenced defendant to a total term of 40 years to life—a base term of 25 years to life on count 1, plus 10 years for the firearm enhancement and five years for the prior serious felony conviction enhancement, and 25 years to life for count 2, to run concurrent to the sentence in count 1. The sentence for count 3 was stayed pursuant to section 654. Defendant timely appealed.

## II.    *Evidence at Trial*

While many of the events preceding the homicide were the subject of conflicting evidence at trial, it was undisputed that on March 2, 2011 at about 1:00 p.m., defendant shot Christina Salazar (Salazar) as she ran across the street near the corner of Adams Boulevard and Maple Avenue in Los Angeles, hitting her in the back and fatally wounding her. It was also undisputed that at some point earlier in the day, Salazar shot defendant's sister, Diana, in the leg, but the precise timing and location of that shooting were in dispute. The prosecution's case therefore focused on proving that defendant chased and shot Salazar with the malice required for murder, rather than in self-defense or defense of others as defendant claimed.

### A.  *Prosecution Evidence*

Salazar lived in Chino, but in March of 2011 was staying with her sister and her sister's family, including her sister's daughter Monique, while attending school. Salazar's sister lived near 29th Street and Main Street in Los Angeles. At that time, defendant lived with his family, including his mother, Martha Garcia, and his sister,

---

[2]     The firearm enhancements under section 12022.53 charged on count 1 in the amended information do not apply to voluntary manslaughter. (§ 12022.53, subd. (a).) Thus, the jury evaluated whether defendant personally used a firearm within the meaning of section 12022.5. subdivision (a), the applicable enhancement for a conviction of voluntary manslaughter.

Diana Garcia,[3] a few blocks away on 27th Street, just west of Maple. Salazar and Diana did not like each other.

### 1. The Morning of the Shooting

Lisa Lopez, Salazar's cousin, testified that she spent the morning of March 2, 2011 with Salazar. Lopez lived nearby, on the north side of Adams, just west of the intersection with Maple. That day, Lopez and Salazar planned to sell food prepared by Lopez's mother-in-law to raise money for an upcoming trip to Las Vegas. Lopez picked up Salazar and Monique in Lopez's car around 8:00 a.m. from Salazar's sister's house and drove them to buy bread. They dropped the bread off at Lopez's house, and Lopez then drove Salazar and Monique back to Salazar's sister's house to shower and change clothes. Lopez picked them up again about 20 to 30 minutes later, around 10:00 a.m., and they returned to Lopez's home to prepare food orders. Sometime between 12:00 p.m. and 1:00 p.m., all three walked together to Ranch Market, located on the southwest corner of Adams and Maple. Salazar and Monique continued walking south on Maple. Salazar planned to drop off Monique at Monique's grandfather's house, located near 29th and Trinity Streets, and then return to Lopez's house. Lopez bought some sodas at the market and returned home.

### 2. The Shooting

On March 2, 2011, around 1:00 p.m., Alberto Sanchez, who is blind in one eye, was walking north on Maple near the corner of 27th Street when he heard yelling. He saw a woman later identified as Salazar running northbound past him and being chased by a group of about five people. The group was about 40 feet behind Salazar. Defendant was part of the group and held a handgun as he ran. One of the members of the group was limping. Sanchez screamed at the group to call the police and an older woman in the group responded "get the fuck out of the way because we are going to kill her." The group continued up Maple and turned left into a driveway just south of Adams, leading to a parking lot on the corner of Adams and Maple. Salazar was screaming and "looked

---

[3]     We refer to individuals with the last name of Garcia by their first names to avoid confusion.

4

desperate." Sanchez continued north after the group once they turned into the parking lot and he lost sight of them.

Sanchez stopped when he reached the driveway. He heard three gunshots and saw defendant fire a gun at Salazar as she ran across Adams.[4] Salazar was about halfway across the street when she was hit. Defendant and the rest of the group then ran back south down Maple. Sanchez ran over to Salazar and saw that she was deceased. Sanchez did not see any struggle between Salazar and defendant or his group prior to the shooting and did not see defendant holding a cell phone.

Several other eyewitnesses offered testimony at trial regarding the shooting. Akeem Coburn was putting his daughter into his vehicle, which was parked on the east side of Maple, north of the intersection with Adams. He saw two "hispanic females . . . holding down a[nother] hispanic female" in the parking lot driveway on the southwest corner of the intersection. The driveway opened onto the south side of Adams, west of the intersection. Coburn also saw defendant standing near the group of females. The female being restrained (Salazar) was screaming and "trying to get away"; Coburn was originally alerted by the screaming, which lasted five to ten seconds. Salazar was "trying to run away" but the other two females were "trying to pull her back by the arms." It did not appear to Coburn that Salazar was aggressive toward the other women or trying to fight back, "she was just trying to get loose and run away from them."

Salazar then broke away and ran into the street heading northwest. Defendant stepped four to five feet into the street, "pointed the gun at her and just started shooting."[5] Coburn heard four to six shots total. Coburn saw Salazar run, get hit with a bullet when she was at least halfway across the street, and then continue running forward toward the sidewalk until she collapsed behind a vehicle. Coburn testified that he was watching Salazar as she was shot, that she was shot in the back and he did not see her turn back

---

[4]     According to the LAPD detective who initially interviewed him, Sanchez said he did not see the actual shooting at Maple and Adams.

[5]     Coburn also testified that defendant was using a cell phone while he was shooting.

around toward the group at any time. He did not see anything in her hands while she was running. After the shots were fired, the group ran south on Maple.[6] Coburn also saw a group of people running toward Salazar to help her. He did not see anyone take anything from that location.

Bradley Dawn was sitting in his car in the parking lot on the northwest corner of Adams and Maple. He "heard a loud bang" that "was pretty clear [] was a gun shot"; the noise caught his attention and he looked toward Adams. Within "a second or two," he saw a man step into the street, raise a gun and fire two shots in quick succession in a westerly direction down Adams. Dawn was unable to see what the man was shooting at. The man and a girl "that was with him" then turned and ran east on Adams and then south on Maple. As the girl ran, Dawn could see she was limping. As he drove away, Dawn saw a young woman on the side of the road holding a cell phone, "obviously in shock," and a body lying at her feet behind a parked white car. He also saw people coming out of the medical building across the street and running toward the victim.

Victor Mejorada was inside his home on the north side of Adams. He heard a gunshot and went to the window. He saw Salazar, a friend of his, running across the street. He then saw defendant on the sidewalk shooting at Salazar. Salazar was in the middle of the street, looking forward when she was shot. Mejorada did not see her turn back toward defendant prior to the shooting. He heard "one or two" shots. Salazar fell in the street, got up and continued toward Lopez's house. Mejorada ran outside and saw Lopez, shouting and crying, near Salazar. After the gunshots, Mejorada saw defendant and two girls running out of the parking lot toward 27th Street. He did not see anyone remove anything from Salazar while she was lying on the street.[7]

---

[6]     Coburn testified that he saw a larger group of people scatter down Maple after the shooting—defendant and the two females ran across the parking lot, joined another group of five to nine people standing near the driveway exiting onto Maple, and the entire group ran south on Maple.

[7]     Mejorada testified inconsistently as to whether he saw Salazar carrying a purse while she was running.

Kevin Guevara had just gotten out of school and was walking on the north side of Adams heading west to the bus stop. He heard girls screaming on the other side of the street and then saw one girl running with a "male chasing after her." Guevara saw Salazar running diagonally toward him across the street. He then heard "more than three" gunshots and he ducked for cover. Salazar was in the middle of the street when defendant shot her, she collapsed, then got back up and tried to run. Defendant "shot her again" and "that's when she collapsed behind the car." Salazar never turned around toward defendant. Defendant then turned and fled toward Maple. Guevara, who had observed the shooting from about half a block away, then walked over to try to help Salazar. Guevara called an ambulance and waited with Salazar until it arrived. He did not see anyone take any property from Salazar.[8]

Lopez, Salazar's cousin, testified that about 20 minutes after she left Salazar and Monique near Ranch Market, she was at her home, located just northwest across Adams from the parking lot where defendant confronted Salazar. Lopez heard what she thought might be a gunshot, but she was not sure because it could have been hammering from the construction work being done on her home. A construction worker then told her that something had happened to her cousin. Lopez went to her front door, looked outside, and saw Salazar in the middle of the street, screaming and running toward her. Salazar was limping and holding her stomach. Lopez grabbed her phone, ran outside and fell; by the time she reached the street Salazar had fallen to the ground behind a white car. She was the first person to reach Salazar. Lopez called 911 and stayed with Salazar until the paramedics arrived. Lopez did not see the shooter and did not see Salazar get shot. Lopez stated Salazar was carrying a purse when they left Lopez's house to walk to the market after noon, but did not have it when she next saw Salazar was running across the

_____

[8]     Guevara testified that while Salazar was running across the street, he saw two girls on the sidewalk on the south side of Adams screaming at Salazar to run and one of them screamed Salazar's name. He assumed those girls were "with" Salazar. After Salazar was shot, while Guevara was trying to help her, he saw one of the same girls run behind a nearby house and then return to the scene, talking on a cell phone.

street.  She stated that she had never seen Salazar with a gun and was not aware that she ever possessed one.

### 3. The Police Pursuit

After returning home, defendant got into a gray Ford Explorer and led LAPD officers on a high-speed chase lasting more than 20 minutes.  Defendant drove erratically, failing to stop for stop signs and red lights, reaching up to 90 miles per hour, colliding with other vehicles, and at times driving on the wrong side of the street.  At one point during the pursuit, defendant drove back to 27th and Maple near his residence and threw a pistol out of his car window.  An LAPD officer recovered the .9 millimeter pistol, which was partially broken from the impact of hitting the ground.  Defendant also threw a gun magazine out of his window near Maple and 24th Street.  Another LAPD officer recovered the magazine, which contained four live rounds of .380-caliber ammunition.  Eventually, defendant again drove back to 27th Street, stopped the vehicle near his house and surrendered to police.

### 4. Investigation

Lucia Montoya, a forensic attendant with the coroner's office, tested Salazar's hands for gunshot residue at approximately 2:00 a.m. on March 3, 2011, after transporting her body from the hospital to the coroner's office.  Debra Kowal, a criminalist with the coroner's office, testified that no gunshot residue was found on either of Salazar's hands.  That meant the findings were inconclusive; Salazar might not have discharged a firearm, might have discharged a firearm but had no gunshot residue deposited on her hands, or the residue could have been removed, such as by washing or wiping the hands.

An autopsy was performed on Salazar's body on March 5, 2011.  Salazar died from a single gunshot wound and resultant bleeding.  The gunshot wound was located in the center of her back between her shoulder blades.  The coroner recovered a .380-caliber bullet from Salazar's chest cavity and noted that the bullet traveled through her body from "right to left back to front and upward."  That trajectory was consistent with someone hunched over and running away from the shooter.  There was no soot or

8

stippling on Salazar's body, indicating the gunshot likely was fired from more than a few feet away.

LAPD Homicide Detective Jose Calzadillas and his partner were assigned to the investigation and arrived at 27th Street and Maple just as the police pursuit concluded. They determined there were two potential shooting locations, one on 27th Street and one on Adams. At the Adams scene, they recovered a .25-caliber spent casing and two spent .380-caliber casings. They also recovered a live .25-caliber round near the middle of the street, about eight to ten feet away from a fresh blood stain. They did not recover a firearm from that location.

Detective Calzadillas interviewed Diana on the day of the incident. She told him Salazar shot her in the leg on 27th Street and then fled towards Adams,[9] and drew a diagram of the location. Diana was the only witness who told him that Salazar was armed with a weapon. She further claimed that she never went to the Adams Street location.[10]

Fadil Biraimah, an LAPD criminalist, analyzed defendant's gun (a .9 millimeter pistol), the .380 and .25-caliber bullet casings recovered from the Adams scene and the .380-caliber bullet recovered from Salazar's body. He determined that the .380-caliber casings and bullet were fired from defendant's pistol. The .25-caliber bullet and casing recovered from the Adams scene were not fired from defendant's pistol, but without the firearm for comparison, Biraimah could not say whether the .25-caliber casing and bullet were both fired from the same gun. Biraimah did not examine the unexpended .25-caliber round recovered from the Adams scene, but he noted there were many reasons why it might have been there.

---

[9]     As detailed below, Diana testified for the defense that although the initial confrontation with Salazar was outside the Garcia residence on 27th Street, Salazar shot her in the leg after they reached Adams and Maple.

[10]     The entirety of Diana's interview was played for the jury. The transcript or recording of that interview was not included in the record on appeal and the Attorney General's summary of, and citations to, that transcript are not evidence we can properly consider.

9

Detective Calzadillas observed a blood trail between 27th Street near defendant's house and the parking lot at Adams and Maple. He couldn't tell in which direction the bleeding person was traveling. When asked by defense counsel what evidence he had that there was a shooting on 27th Street (as opposed to two shootings at Adams and Maple), he noted that Diana told him she had been shot on 27th Street. He also relied on Sanchez's testimony that he saw a woman limping to and from the Adams location and a statement by a 911 caller that she saw "Little Chucky" (Salazar) with a gun on 27th Street and heard a gunshot just as "they" (presumably Salazar and Diana) "went out of view northbound" on Maple from 27th Street.[11]

Detective Calzadillas testified that he checked the data on defendant's phone and discovered there was a call at 1:09 p.m. on the date of the shooting. He did not specify at trial whether the call was made to or received by defendant. Detective Calzadillas was unable to discover the identity of the owner of that phone number.

### B. Defense Evidence

Defendant did not testify at trial, but introduced several percipient witnesses and experts to support his self-defense case. Defendant's evidence focused on Salazar's role as the aggressor against Diana and, later, defendant. He argued that he shot Salazar based on a reasonable belief that it was necessary to protect himself and/or Diana from further immediate harm after Salazar turned toward them and attempted to shoot at them again as she fled.

#### 1. Testimony of Percipient Witnesses

Erica Torres, a friend of Diana's, testified that she was in her home on 27th Street, near the Garcia residence, on March 2, 2011. At some point that afternoon, she left to walk to the store. At the corner of 27th and Maple, a gold vehicle stopped and she saw Salazar (whom she referred to as "Lil Chuckie") get out of the front passenger's seat; she

---

[11] Detective Calzadillas identified the 911 caller as Sabrina Garcia and discussed some of the contents of her 911 call during cross-examination at trial. The record on appeal does not contain a transcript of the call or any other information regarding the caller's identity or details of the call.

also noticed "a couple of girls" in the back seat. She recognized the vehicle as one that Salazar's older sister usually drove.[12] Salazar asked Torres if she had seen Diana that day and Torres said she had not. Salazar then said she wanted to kill Diana. Torres "just looked away and walked to [her] destination." When Torres looked back, she saw the vehicle turn onto 27th Street. Torres stated it "wasn't the first time" she heard Salazar threaten to kill or "jump" Diana. That day, she did not warn Diana about the threat and "didn't think [Salazar] was being serious." After Torres returned home from the store (about 20 minutes later) she heard gunshots. At some point, she heard the police outside and tried to go over and speak to Diana, who was sitting on her porch wearing bloody pants, but a police officer told her to return home. Torres did not report Salazar's threat against Diana until approximately six months later, when she was interviewed by the defense.

Martha Garcia is defendant's and Diana's mother. She testified that Salazar "had problems with Diana for a long time" and would "come to the house to look for Diana." Around noon on March 2, 2011, Martha and Diana left the house to buy some food. As they were walking to their car, they saw Salazar across the street. Salazar started shouting at Diana and motioning for Diana to come across the street. Salazar was carrying a black purse. Diana started yelling back at Salazar; Martha was pulling Diana by her sweater, "trying to pull her . . . back into the house . . . because I didn't want anything to happen." Diana broke loose and went across the street, where she and Salazar continued arguing. Martha heard Diana yell "oh my god, she's got a gun," but did not see any gun herself. Martha ran into her house and told defendant and his friend, Priscilla, that Salazar was outside with a gun. She then called her husband and told him to call 911. By the time she hung up the phone, defendant and Priscilla had left the house. She went back outside but did not see anyone. She denied leaving her house and

---

[12]     During the prosecution's case, Lopez testified that Salazar's sister, with whom Salazar was staying, drove a gold Intrepid, but that the sister took the car to work that day and did not arrive at Lopez's house (on her way home for lunch) until shortly after Salazar was shot. Lopez did not see Salazar in a gold vehicle that day.

going toward Maple and Adams and stated that she cannot run due to her arthritis. At some later point, she saw defendant, Diana, and Priscilla coming back down 27th Street from the direction of Maple. Diana was limping and bleeding.

At trial, Martha denied telling an officer during an interview on March 2, 2011 that she heard a gunshot during the argument between Salazar and Diana and then ran into the house. She also denied telling the officer that after defendant and Diana returned, they both fled the location in her car. She claimed that the officer was lying and was "corrupt." When she was interviewed again a few hours after the shooting at the police station, she told Detective Calzadillas she never heard a gunshot.

Diana testified that she had stayed home sick from high school on March 2, 2011. As she was leaving her house with her mother, she saw Salazar across the street. She had known Salazar for about four years and had had "several problems" with Salazar before, including having Salazar and her sisters "jump" Diana on a prior occasion. Diana testified that Salazar did not like her because of a guy Diana was dating and because she refused Salazar's efforts to get her to join the Ghetto Boyz gang.[13]

That day, Salazar was motioning for Diana to come across the street and was calling Diana a "fucking bitch, a fucking slut," and an "ugly-ass Chihuahua." Diana's mother tried to restrain her, but Diana told her "I'm fed up. I'm tired of living like this." She crossed the street to confront Salazar "to see what the problem was." Salazar then said "let's go to the corner to talk." As they were walking toward the corner, Salazar pulled out a gun. Diana described it as a small gun, which Salazar pulled out of a "big, dark purse." Diana was scared and said "oh, my god, she has a gun." She then tried to convince Salazar to "put the gun down. We can talk it out."

Salazar started running up Maple toward Adams and Diana turned and saw defendant and Priscilla coming toward her. Diana ran with them, but testified that she

---

[13] Defendant claimed Salazar was a gang member and used the nickname "Lil Chuckie." Salazar's cousin, Lopez, denied that Salazar was ever in a gang, but acknowledged on cross-examination that Salazar was "throwing" a sign for the Ghetto Boyz gang in a photo introduced by the defense.

"wasn't thinking" when she decided to do so. They ran up to Adams and Maple, through the shopping center parking lot on the southwest corner, and stopped on the sidewalk. Defendant was on his cell phone and was "reaching out to give [Salazar] the phone. He was telling her to take the phone . . . and put the gun down." But Salazar refused, said "fuck you," and shot Diana in the leg.[14] Salazar was about two feet from Diana at the time.

After she was shot, Diana tried to take cover behind a car in the parking lot because she thought Salazar might shoot her again.[15] Salazar started running across the street in a northwest direction. Then Salazar leaned forward, "it looked almost as if she was going to fall, and she twisted to the left and she had both hands on the gun." Diana ducked for cover after she saw the gun in Salazar's hand. She heard two gunshots back to back. Diana then limped home with defendant and Priscilla.

Diana testified that she originally told the police on the day of the incident that she got shot on 27th Street because she was scared. She "didn't think they were going to believe me, and I didn't want to be involved with the other -- with the incident, so I tried to keep us like as far as we can [sic] from that incident." She refused to sign the diagram she had drawn during her interview with police on March 2, 2011.

Diana stated she didn't see defendant go into the street or fire shots because she was in shock and scared and was "too busy holding [her] injury." She never saw defendant with a gun. She didn't remember looking to see that Salazar was shot, stating "That's when I just saw [defendant] and Priscilla running, so that's when I started running, too." She said she only found out that Salazar had died and why defendant was in jail near the end of her March 2, 2011 interview with the police. She did not know Salazar had died when she drew the diagram showing she was shot on 27th Street.

---

[14]     A .25-caliber bullet was removed from Diana's leg at the hospital on March 22, 2011 and turned over to the LAPD.

[15]     During cross-examination, Diana said she took cover behind a car parked at the curb.

Diana admitted during cross-examination that defendant called her while he was engaged in the police pursuit. Diana tried to convince him to come home, not to make things worse. After defendant tossed the gun out of the car near the Garcia family home and drove away, Diana texted him that "they [the police] got the gun, the pigs." She claimed that was the first time she saw the gun.

### 2. *Testimony of Defendant's Experts*

Dr. Kenneth Solomon, forensic scientist, testified as a reaction time expert for defendant. Given a hypothetical matching the version of events related by Diana (that Salazar shot her, then ran, then turned back around toward Diana and defendant with her gun, then was shot by defendant), Dr. Solomon gave his opinion of the time it would take for defendant to perceive Salazar turning back toward him and react with two gunshots, hitting her with the second shot. The fastest possible time would be around 1.75 seconds, which would give Salazar time to turn back around to face forward so that the bullet would hit her in the back. He assumed for the hypothetical that Salazar turned toward defendant and then immediately turned back around.

Anthony Paul, a firearms expert, examined the live .25-caliber round recovered from the Adams scene and offered the opinion that the markings on the bullet were consistent with it being jammed in a gun. He also stated that a jammed bullet is generally removed from the gun by the user pulling back the slide to eject the bullet and clear the gun and, in this case, the bullet was "extracted and ejected manually from the gun." On cross-examination, Paul discussed a "stove pipe" situation, where the bullet is fired but the expended casing becomes caught in the gun and is not automatically ejected. In that hypothetical, you would not find the expended casing at the location of the shooting, unless the shooter had manually ejected the casing.

Randolph Beasley testified as defendant's expert on blood spatter. Based on his review of photographs of the crime scene and the blood trail, he offered the opinion that the person depositing the blood trail was traveling from the Adams scene south on Maple and then west on 27th Street, ending at defendant's residence. He also noted that some of

14

the blood stains were inconclusive as to the direction of travel, but none of the stains showed travel from 27th Street north to the Adams scene.

## C. *Rebuttal*

LAPD Officer Manuel Gutierrez testified that he interviewed Martha Garcia in Spanish at the Garcia residence on the day of the incident. She told him that she saw the butt of a gun inside Salazar's purse as Salazar and Diana were arguing and walking east on 27th Street. Martha heard a gunshot and then ran inside to call for help.

# DISCUSSION

## I. *Sufficiency of the Evidence*

Defendant contends that there was insufficient evidence to support his voluntary manslaughter conviction because all the evidence suggested that he shot Salazar in self-defense.[16] As such, he argues that the "only rational conclusion" for the jury to reach was that Salazar's killing was justifiable homicide. We conclude that substantial evidence supports defendant's conviction and therefore affirm.

## A. *Legal Principles*

In reviewing a challenge to the sufficiency of the evidence, "the relevant inquiry is whether, on review of the entire record in the light most favorable to the judgment, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. [Citations.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1180.) "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing *without*

---

[16] Defendant does not challenge his convictions on counts two (evading a police officer) and three (felon in possession of firearm).

15

malice is guilty of the lesser included offense of voluntary manslaughter. (§ 192, subd. (a).) The element of malice necessary for murder may be negated by a showing either that the defendant acted "upon a sudden quarrel or heat of passion" or in imperfect self-defense. (*Ibid.*; *People v. Blakeley* (2000) 23 Cal.4th 82, 87-88 (*Blakeley*).) "Heat of passion arises if, "'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) Under the imperfect self-defense doctrine, a defendant acts in "the unreasonable but good faith belief" that it is necessary to defend oneself or another person from the imminent danger of death or great bodily injury. (*Blakely, supra,* 23 Cal.4th at p. 88 (citations omitted).) By contrast, if a defendant believed that his use of deadly force was necessary to defend himself or another from such imminent danger, and that belief was objectively reasonable, then he acted in "'perfect self-defense'" and is exonerated completely. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

    B.  *Substantial Evidence Supported Defendant's Conviction*

    Defendant contends that the undisputed evidence established that "this was a victim provoked homicide" and that Salazar posed a continuing imminent threat at the time he shot her. In support of this argument, defendant selectively relies on the evidence consistent with his version of the shooting—that it was "only after [Salazar] actually shot Diana, ran across Adams Boulevard, turned back and attempted to shoot her a 2nd time," that defendant shot Salazar. However, while there was certainly evidence at trial that supported defendant's theory, defendant ignores or minimizes the substantial evidence supporting the jury's finding that defendant shot Salazar either in the unreasonable belief that she posed an imminent lethal threat or in the heat of passion.[17]

---

[17]    At trial and on appeal, both parties focused primarily on the self-defense theory. But the jury was instructed as to both heat of passion (using CALCRIM No. 570) and self-defense (CALCRIM No. 571).

16

First, while defendant claims Salazar shot Diana just moments before he shot Salazar, there was contrary evidence suggesting that Salazar shot Diana during their initial confrontation on 27th Street. Indeed, Diana herself initially claimed as much during her report to the police on the day of the incident and confirmed that report with a diagram. In addition, several witnesses, including defendant's mother Martha, reported hearing a gunshot on 27th at the time of the incident there between Diana and Salazar, and Sanchez reported seeing Diana limping while traveling to and from the Adams scene.

But even if we accept defendant's contention that Salazar shot Diana at the Adams location immediately before running across Adams, the undisputed fact remains that defendant shot Salazar while she was running away from him and Diana and did so when she was at least halfway across the street. Thus, to show that defendant had a reasonable belief that he had to shoot a fleeing Salazar to defend himself and/or Diana against an imminent threat, defendant relies on the evidence that Salazar turned back toward them and attempted to shoot again.

But the prosecution presented multiple eyewitnesses who testified that they observed Salazar as she ran, and as she was hit by defendant's bullet, and none of them saw her turn back toward the Garcias. Nor did any of them see Salazar with a gun. In fact, Diana was the only person who testified that Salazar ran and then turned toward Diana and defendant with a gun in her hand.[18] Further, the undisputed evidence establishing that the bullet struck Salazar in her back was entirely consistent with the inference that she was facing forward as she ran and did not turn. The jury was free to weigh the testimony and credibility of all of the witnesses and to reject defendant's claim

---

[18]  Notably, Diana's credibility as a witness was impeached on several key issues. She admitted to lying to the police about where she was shot and her presence at the Adams location. She also acknowledged referring to police as "pigs" in a text to defendant and her testimony at trial included other inconsistencies such as where and when she took cover from Salazar and how much she knew about Salazar's shooting at the time it occurred. While there was evidence that two other people—Sabrina Garcia (the 911 caller) and Martha (in a statement she recanted on the stand)—stated they saw Salazar with a gun on 27th Street, Diana was the only witness to testify that Salazar had a gun once she reached Adams and Maple.

that he acted reasonably under the circumstances. It is not the role of the "reviewing court [to] resolve[] credibility issues nor evidentiary conflicts . . . [r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]" (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.)

Defendant acknowledges that none of the eyewitnesses, other than Diana, saw Salazar turn, but he argues that the .25-caliber bullets found at the Adams scene "conclusive[ly]" establish that she did so. That evidence was consistent with defendant's theory that Salazar shot Diana in the leg at the Adams scene (leaving a .25-caliber bullet fragment in her leg and a casing at the scene) and then tried to shoot again but failed when her gun jammed (leaving a live .25-caliber round at the scene). But the evidence was far from conclusive on that point. Contrary to defendant's claim, his firearms expert did not testify that a .25-caliber bullet in fact "had been ejected when Christina's gun jammed." His expert merely stated that the markings on the live round were consistent with it being jammed in a gun.

Moreover, no gun was ever recovered, and the prosecution presented evidence suggesting alternative explanations for the presence of the .25-caliber live round and expended casing at the Adams scene. And while defendant notes that his reaction time expert opined that it would have been possible for Salazar to turn around to face defendant and Diana and turn again to face forward before being shot in the back with defendant's second bullet, that possibility does not constitute evidence that this was the actual sequence of events. The expert's opinion is equally consistent with Salazar facing forward the entire time as she ran across Adams.

In sum, viewing the evidence in the light most favorable to the prosecution, we conclude that substantial evidence supports the verdict against defendant.

## II.  *Motion for New Trial*

Defendant argues that the trial court erred in denying his motion for a new trial, as the jury's verdict was not supported by the evidence. We disagree.

### A. Relevant Proceedings

The court heard argument on defendant's motion for a new trial on June 28, 2013. The trial court indicated its tentative ruling that it was "not inclined to grant a new trial," as the evidence presented to the jury "was more than sufficient to sustain a conviction." The court noted that while "there is no dispute" that Salazar shot Diana, "there is a big dispute about when it happened and whether [defendant] was present when it happened." The court acknowledged the "conflicting testimony" and that the jury "has the right to reject or accept either version of the case. . . . There is a dispute in the evidence and the jury accepted one theory and not the other."

The court and defense counsel then engaged in the following colloquy:

"The court: Aren't you asking me to reweigh the evidence as opposed to make a determination whether the evidence, if believed, was sufficient to support a conviction? Aren't you asking me to put myself in the position of the jury and reweigh the evidence?

Mr. Mgdesyan: Well, I think the court has the power.

The court: Well, I could set aside the verdict. That's a different motion, which I am not inclined to do. But there was a motion for a new trial where the issue is sufficiency of the evidence, it doesn't seem to me that I -- within my discretion, to reweigh the evidence when the standard is, was there sufficient evidence presented which, if believed by the jury, would be sufficient to prove the charge beyond a reasonable doubt. That's the standard on a motion for a new trial.

Mr. Mgdesyan: I understand that, but I don't . . . think the evidence presented at this case establishes that my client -- what the jury's verdict came back. It doesn't establish that. And I would ask the court to grant the motion for a new trial because the verdict is not consistent with what was presented at trial, your honor. And the court had the power to set aside the verdict if it believed . . . that the jury's verdict was not supported by the evidence in this case."

The court then noted that its focus "is to determine whether the evidence presented if it was sufficient, if believed, to prove the case beyond a reasonable doubt. And there was sufficient evidence for them to believe -- to reject your expert, to find him not

credible, and to believe that the defendant chased her down after they shot [sic] and executed her." Defense counsel argued that Detective Calzadillas made up the theory that Diana was shot on 27th Street and there was "no evidence to corroborate this." The court responded that "I see no reason to believe that. . . . [¶] The motion for a new trial is denied. The jury heard the case. They made the decision. I see absolutely no reason to override their decision."

### B. Legal Principles

The trial court may grant a new trial when the verdict is contrary to the evidence. (§ 1181, subd. (6).) While the trial court "must weigh the evidence independently," it is "guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 523-524 (*Davis*).) "The trial court 'should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' [Citation.]" (*Id*. at p. 524.) "If the court is not convinced that the charges have been proven beyond a reasonable doubt, it may rule that the jury's verdict is 'contrary to the . . . evidence.' [Citations.]" (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.)

There is a strong presumption that the trial court properly exercised its broad discretion in ruling on a motion for a new trial. (*Davis*, *supra*, 10 Cal.4th at p. 524.) "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (*People v. Williams* (1988) 45 Cal.3d 1268, 1318.)

### C. Trial Court Properly Exercised Its Discretion

Defendant contends that the trial court improperly refused to exercise its discretion to "independently review the evidence and determine if the weight of that evidence was contrary to the jury's finding" that defendant committed manslaughter. Pointing to the court's comments during argument on his motion, defendant claims the trial court "was under the mistaken impression" it was bound by the jury's determination.

20

We find no error in the court's consideration of defendant's motion. The record establishes that the court, having heard all of the evidence at trial, believed that the evidence presented "was more than sufficient to sustain a conviction." In particular, the court noted the conflicting evidence regarding defendant's self-defense claim, including evidence supporting the prosecutor's theory that Diana was shot on 27th Street, and concluded the evidence was sufficient to reject the testimony of defendant's experts and find that defendant "chased [Salazar] down after [Salazar shot Diana] and executed her." The statements by the trial court that it saw "no reason" to override the jury's decision are consistent with the court's independent assessment of the evidence and agreement with the jury's determination. Thus, the record does not establish that the trial court misunderstood the scope of its duty and we will not presume otherwise. (*People v. White Eagle* (1996) 48 Cal.App.4th 1511, 1521–1523.)

Alternatively, defendant contends that even if the trial court properly understood and applied the correct standard, it abused its discretion in refusing to override a jury verdict that was "contrary to the overwhelming weight of the evidence." As discussed in Section I, *supra*, we disagree with defendant's claim that the jury verdict was unsupported by substantial evidence. As such, the trial court did not abuse its discretion in denying defendant's motion for new trial.[19]

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


WILLHITE, Acting P. J.                                    MANELLA, J.

---

[19]     For the same reasons, we reject defendant's argument that the trial court should have dismissed the manslaughter charge in the interest of justice under section 1385.

21